UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE ROAD DAWGS MOTORCYCLE CLUB OF
THE UNITED STATES, INC.; NEW YORK
ROAD DAWGS MOTORCYCLE CLUB, INC.;
MASSACHUSETTS ROAD DAWGS, INC.; and
RICHARD E. DOWNEY,                                        5:05-CV-0966
                            Plaintiffs,                   (GTS/DEP)

v.

"CUSE" ROAD DAWGS, INC.; and JOHN
DOES 1-XX,
                            Defendants.
_____

APPEARANCES:                                  OF COUNSEL:

MARJAMA MULDOON BLASIAK & SULLIVAN LLP    JAMES R. MULDOON, ESQ.
  Counsel for Plaintiffs                  ROBERT E. RIGBY, JR., ESQ.
250 South Clinton Street, Suite 300
Syracuse, New York 13202

CARROLL & CARROLL LAWYERS, P.C.           WOODRUFF L. CARROLL, ESQ.
  Counsel for Defendants
441 South Salina Street
Syracuse, New York 13202

HON. GLENN T. SUDDABY, United States District Judge

**SECOND AMENDED MEMORANDUM DECISION and ORDER**

On December 22, 2009, the Court issued an Amended Decision and Order in this

trademark infringement action.  (Dkt. No. 31.)  In that Amended Decision and Order, the Court,

*inter alia*, barred Defendant's continued use of a gold-colored stylized pit bull head in its logo.

(*Id.* at 50, 54.)  After *sua sponte* reconsidering governing legal standards, the Court has decided

that such continued use, in and of itself, would not infringe on Plaintiff's trademark.  In

accordance with that decision, the Court issues the current Second Amended Decision and

Order.

Currently pending before the Court in this trademark infringement action is a motion for summary judgment filed by The Road Dawgs Motorcycle Club of the United States, Inc., New York Road Dawgs Motorcycle Club, Inc., Massachusetts Road Dawgs, Inc., and Richard E. Downey ("Plaintiffs"), and a cross-motion for summary judgment filed by 'Cuse Road Dawgs, Inc., and John Does 1-XX ("Defendants").  (Dkt. Nos. 13, 15.)  For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part, and Defendants' cross-motion is denied.

# TABLE OF CONTENTS

I.     BACKGROUND..............................................................................................4
       A.     Plaintiffs' Complaint..................................................................4
       B.     Plaintiffs' Motion.......................................................................4
       C.     Defendants' Cross-Motion.........................................................5

II.    APPLICABLE LEGAL STANDARD...........................................................5

III.   UNDISPUTED MATERIAL FACTS..........................................................9
       A.     Facts Material to Road Dawgs Motorcycle Club.....................9
       B.     Facts Material to 'Cuse Road Dawgs Motorcycle Club.........11
       C.     Facts Material to Both Marks or Clubs...................................14

IV.    ANALYSIS OF PLAINTIFFS' MOTION....................................................16
       A.     Plaintiffs' Claim Under Sections 1114(1) of the Lanham Act....................16
              1.     Validity and Entitlement to Protection..............................17
                     a.     Classification of Marks Generally.........................18
                            i.     Generic Marks..............................................18
                            ii.    Descriptive Marks.........................................19
                            iii.   Suggestive Marks..........................................20
                            iv.    Arbitrary and Fanciful Marks......................20
                     b.     Classification of Plaintiffs' Mark.........................20
                            i.     Whether Plaintiffs' Mark Is Generic...........20
                            ii.    Whether Plaintiffs' Mark Is Descriptive or Suggestive........21
                     c.     Contestability.........................................................25
                     d.     Equitable Defenses.................................................27
                            i.     Defendants' First and Third Defenses.........28
                            ii.    Defendants' Second Defense........................35
              2.     Likelihood of Confusion....................................................37
                     a.     Strength of Plaintiffs' Mark..................................38
                     b.     Similarity Between Parties' Marks........................39
                     c.     Proximity of Parties in Marketplace.....................41
                     d.     Likelihood that Plaintiffs Will "Bridge-The-Gap"...........43
                     e.     Evidence of Actual Confusion...............................43
                     f.     Defendants' Intent in Adopting the Mark.............45
                     g.     Quality of Defendants' Services............................46
                     h.     Sophistication of Consumers.................................47
              3.     Balance of Equities..........................................................48
       B.     Plaintiffs' Request for Relief Under Section 1116 of the Lanham Act...................48
       C.     Plaintiffs' Other Requests for Relief........................................51
       D.     Plaintiffs' Other Claims...........................................................53

# I.    BACKGROUND

## A.    Plaintiffs' Complaint

Plaintiffs filed this trademark infringement action, pursuant to 15 U.S.C. § 1114(1), 15 U.S.C. § 1116, 15 U.S.C. § 1125(a)(1), Common Law Trademark Infringement, and New York General Business Law §§ 349 and 350, against Defendants on August 2, 2005.  (Dkt. No. 1.) Generally, Plaintiffs' Complaint alleges that Defendants' use of the name "'Cuse Road Dawgs" infringes on Plaintiffs' rights as registrants of the mark "ROAD DAWGS."  (*Id.*)  More specifically, liberally construed, Plaintiffs' Complaint alleges as follows: (1) Defendants' use of "'Cuse Road Dawgs" is likely to cause an appreciable number of consumers to be confused as to the origin and affiliation of Defendants; (2) Plaintiffs never authorized Defendants' use of the mark at issue; (3) Defendants engage in and are associated with criminal activity; and (4) Defendants' actions caused and continue to cause Plaintiffs irreparable harm.  (*Id.*)

## B.    Plaintiffs' Motion

In their motion for summary judgment, Plaintiffs argue that they are entitled to summary judgment because, based on the current record, there is no genuine issue of material fact with respect to the protectability of the "ROAD DAWGS" mark, and the *Polaroid* balancing test demonstrates the existence of a likelihood of confusion between the name "ROAD DAWGS" and the name "'Cuse Road Dawgs."  For the foregoing reasons, Plaintiffs argue that the Court should (1) grant judgment in their favor on the issues of liability and infringement, (2) permanently enjoin Defendants' use of the name "'Cuse Road Dawgs," and (3) hold a hearing on the issue of damages.  (Dkt. No. 13, Part 13, at 1 [Plfs.' Memo. of Law].)

C.    **Defendants' Cross-Motion**

After Plaintiffs filed a motion for summary judgment, Defendants filed a cross-motion

for summary judgment with this Court.  (Dkt. No. 15.)  Generally, in their motion, Defendants

argue that they are entitled to summary judgment, based on the current record, because (1)

Plaintiffs' mark is either generic or merely descriptive, and is therefore not entitled to protection,

and (2) there is no likelihood of confusion between "'Cuse Road Dawgs" and "ROAD DAWGS"

under the *Polaroid* balancing test as a matter of law.  (Dkt. No. 15, at 29-33 [Defs.' Memo. of

Law].)  In the alternative, Defendants argue that they are entitled to summary judgment because

(1) Plaintiffs failed to allege any damages, (2) they were using their mark in commerce before

Plaintiffs' publication of their mark, and/or (3) they are entitled to the equitable defenses of

laches, estoppel and acquiescence, which would bar a finding in favor of Plaintiffs with respect

to liability and infringement.  (Dkt. No. 15, at 35 [Defs.' Memo. of Law].)

## II.    APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court

must resolve all ambiguities and draw all reasonable inferences against the moving party.

However, when the moving party has met its initial burden of establishing the absence of any

genuine issue of material fact, the nonmoving party must come forward with "specific facts

showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).

What this burden-shifting standard means when a non-movant has failed to respond to a

movant's motion for summary judgment is that "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  However, the non-movant's failure to respond to the movant's motion for summary judgment lightens the movant's burden on the motion.

More specifically, where a non-movant has failed to properly respond to a movant's factual assertions contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the factual assertions contained in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record.  *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004); *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996); N.D.N.Y. L.R. 7.1(a)(3); N.D.N.Y. L.R. 56.2.[1]

Similarly, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in

---

[1]     *See* Fed. R. Civ. P. 83(b) (allowing district court to regulate motion practice in any manner consistent with federal law and the federal rules); Fed. R. Civ. P. 83, Advisory Committee Notes: 1995 Amendments ("The proscription of [not enforcing a local rule in a way that causes a party to lose any right because of a nonwillful failure to comply] is narrowly drawn . . . [and does not] affect the court's power to enforce local rules that involve more than mere matters of form–for example, a local rule requiring parties to identify evidentiary matters relied upon to support or oppose motions for summary judgment.").

that memorandum of law under Local Rule 7.1(b)(3).[2]  Stated another way, where a movant has

properly filed a memorandum of law (in support of a properly filed motion for summary

judgment), and the non-movant has failed to respond to that memorandum of law, the only

remaining issue is whether the legal arguments advanced in the movant's memorandum of law

are *facially meritorious*.[3]  A movant's burden in making legal arguments that are facially

meritorious has appropriately been characterized as "modest."[4]

---

[2]      *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-
0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's
failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a
concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

[3]      *Hernandez v. Nash*, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8
(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) [citations omitted]; *accord*, *Topliff v. Wal-Mart Stores
East LP*, 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n.43 (N.D.N.Y. March 22, 2007)
(Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n.40
(N.D.N.Y. Feb. 12, 2007), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007)
(McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n.2
(N.D.N.Y. Dec. 19, 2006), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007)
(Kahn, J.).

[4]      *Ciaprazi v. Goord*, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22,
2005) (Sharpe, J.; Peebles, M.J.) [citation omitted]; *accord*, *Saunders v. Ricks*, 03-CV-0598,
2006 WL 3051792, at *9 & n.60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-
Recommendation); *cf. Race Safe Sys. v. Indy Racing League*, 251 F. Supp.2d 1106, 1109-1110
(N.D.N.Y. 2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments,
and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under
Local Rule 7.1[b][3]); *Wilmer v. Torian*, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2
(N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but
recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the
reasons set forth in defendants' motion papers)*, adopted by* 1997 U.S. Dist. LEXIS 16340, at *2
(N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord*, *Carter v. Superintendent Montello*, 95-CV-989,
1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.
Supp. 595 (N.D.N.Y. 1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[5]  In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the non-movant should be treated as an affidavit.  *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004). That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed. R. Civ. P. 56(e)(1).  In addition, such an affidavit (or verified complaint) must not be conclusory.  Fed. R. Civ. P. 56(e)(2).

---

[5]    *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 92 n.4 (2d Cir. 2008) ("Fed. R. Civ. P. 56 does not impose an obligation on the court considering a motion for summary judgment to perform an independent review of the record to find proof of a factual dispute.") [citation omitted]; *N.Y. State Teamsters Confer. Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005) ("We have previously recognized that district courts have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules.  Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'"); *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470-71 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute. . . .  Furthermore, because nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations."); *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

III.    **UNDISPUTED MATERIAL FACTS**

Based on the current record before the Court, the following material facts are undisputed:

A.    **Facts Material to Road Dawgs Motorcycle Club**

1.    In 1995, Plaintiffs founded a motorcycle club in New Hampshire;[6]

2.    At the time, Plaintiffs' motorcycle club was, and still is, composed exclusively of

members of law enforcement;[7]

3.    In 1996, Plaintiffs' motorcycle club was incorporated as a non-profit corporation

under the name "Road Dawgs" in New Hampshire;[8]

4.    In 1997, Plaintiff "Road Dawgs Motorcycle Club of the United States"

("RDUSA") became the sponsor of a club chapter in Syracuse, New York;[9]

5.    Since 1997, the members of Plaintiff RDUSA's club chapter in Syracuse, New

York, have been using Plaintiffs' mark in concert and connection with Plaintiff RDUSA

motorcycle club activities;[10]

6.    By 1998, Plaintiff RDUSA had become the sponsor of several club chapters

---

[6]    (Dkt. No. 15, at 94 [Plfs.' Response to Defs.' Motion, attaching page "7" of Richard Downey's deposition transcript] [hereinafter "Deposition of Richard Downey"].)

[7]    (*Compare* Dkt. No. 13, Part 2, ¶ 4 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 22, ¶ 4 [Defs.' Rule 7.1 Response, denying referenced fact but not citing record evidence that actually controverts referenced fact]; *see also* Dkt. No. 13, Part 7, at 3 [Defs.' Reply to Plfs.' Request for Admission, admitting referenced fact]; Dkt. No. 15, at 29 [Defs.' Opp. Memo. of Law, admitting referenced fact]; Dkt. No. 15, at 134-35 [Deposition of Richard Downey, supporting referenced fact]; )

[8]    (Dkt. No. 15, at 94 [Deposition of Richard Downey].)

[9]    (*Id*. at 102.)

[10]    (*Id*. at 107.)

across the United States;[11]

7.      At some point before February of 1999, Plaintiffs created a trademark ("Plaintiffs'

mark"), which was, and still is, a standard character mark or typed mark, and, as such, was, and

is, not limited to any particular font style, size, or color for purposes of an infringement action;[12]

8.      On or about February 2, 1999, Plaintiffs filed a service application with the

United States Patent and Trademark Office ("PTO") (Service Number 75/633,222) regarding

their mark;[13]

9.      On or about October 3, 2000, the United States Patent and Trademark Office

registered U.S. Service Mark Reg. No. 2,392,251, for the mark ROAD DAWGS for use in

connection with motorcycle clubs across the United States;[14]

10.     On or about April 7, 2005, Plaintiff RDUSA became the owner of Plaintiffs' mark

---

[11]      (*Id.*)

[12]      (*Compare* Dkt. No. 13, Part 2, ¶ 2 [Plfs.' Rule 7.1 Statement, asserting fact, and
supporting that assertion with accurate record citations] *with* Dkt. No. 15, at 22, ¶ 2 [Defs.' Rule
7.1 Response, admitting referenced fact]; *see also* Dkt. No. 15, at 107-108, 167-68 [Deposition
of Richard Downey]; Dkt. No. 15, at 49 [stating that, as of 2/2/99, Plfs.' mark was designated as
a "Typed Drawing"].)  *See also* 37 C.F.R. § 2.52 (Trademark Rule 2.52).

[13]      (*Compare* Dkt. No. 13, Part 2, ¶ 2 [Plfs.' Rule 7.1 Statement, asserting fact, and
supporting that assertion with accurate record citations] *with* Dkt. No. 15, at 22, ¶ 2 [Defs.' Rule
7.1 Response, admitting referenced fact]; *see also* Dkt. No. 13, Parts 4-5 [Certificate of
Registration and TARR Status Report]; Dkt. No. 15, at 107-108, 167-68 [Deposition of Richard
Downey]; Dkt. No. 15, at 49.)  *See also* 15 U.S.C. § 1057(b); 15 U.S.C. § 1115(a).  *See, infra*,
Part IV(A)(1) of this Second Amended Decision and Order, for a discussion of the implications
of producing a certificate of registration.

[14]      (*Compare* Dkt. No. 13, Part 2, ¶ 1 [Plfs.' Rule 7.1 Statement, asserting referenced
fact, and supporting that assertion with accurate record citations] *with* Dkt. No. 15, at 22, ¶ 1
[Defs.' Rule 7.1 Response, admitting referenced fact].)

by assignment from Plaintiff Richard Downey;[15]

11.     As of August 2, 2005 (the date of filing of this action), the Syracuse club chapter

was composed of approximately 40 of the roughly 200 national members of Plaintiffs'

motorcycle club;[16]

12.     As of August 2, 2005, several of the RDUSA club chapters had worn Plaintiffs'

mark, and had denoted the particular state of a club chapter through lettering on the bottom of

the mark;[17]

### B.     Facts Material to 'Cuse Road Dawgs Motorcycle Club

13.     Since August 21, 1999, Defendants have used the name "'Cuse Road  Dawgs"

("Defendants' mark")  in commerce;[18]

14.     Since about that time, members of Defendant "'Cuse Road Dawgs" have worn

apparel displaying Defendants' mark;[19]

15.     Defendants are not authorized by Plaintiff RDUSA or any other Plaintiff to use

---

[15]     (*Compare* Dkt. No. 13, Part 2, ¶ 3 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 22, ¶ 3 [Defs.' Rule 7.1 Response, admitting referenced fact].)

[16]     (Dkt. No. 15, at 108-09 [Deposition of Richard Downey].)

[17]     (*Id*. at 107-111.)

[18]     (*Compare* Dkt. No. 15, at 24, ¶ 18 [Defs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with record citation indicating that date of receipt of "sew on rockers" was "8/21/99"] *with* Dkt. No. 16, Part 2, at 2, ¶ 18 [Plfs.' Rule 7.1 Response, admitting referenced fact].)

[19]     (*Compare* Dkt. No. 13, Part 2, ¶ 8 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 23, ¶ 8 [Defs.' Rule 7.1 Response, admitting referenced fact]; *cf.* Dkt. No. 15, at 11-12, ¶¶ 3(h)-3(j), 3(x) [Affidavit of Kenneth Orr, asserting referenced fact].)

Plaintiffs' mark in connection with motorcycle clubs;[20]

16.     In or about June of 2000, Defendants established a clubhouse for social activities at 510 Midland Avenue, Syracuse, New York;[21]

17.     Currently, Defendants still maintain that clubhouse;[22]

18.     Since about June of 2000, Defendants' clubhouse has displayed Defendants' mark on the exterior of the building;[23]

19.     On January 26, 2001, Defendants were incorporated as a non-profit organization in the State of New York;[24]

20.     At about that time, Defendants' motorcycle club was, and still is, composed of

---

[20]     (*Compare* Dkt. No. 13, Part 2, ¶ 9 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citations] *with* Dkt. No. 15, at 22, ¶ 9 [Defs.' Rule 7.1 Response, denying referenced fact, but citing only affidavit that (1) is vague as to the date of the discussion and the identity of the speaker, (2) is immaterial to the factual assertion regarding authorization, and (3) in any event, is not notarized or sworn pursuant to 28 U.S.C. § 1746]; *see also* Dkt. No. 13, Part 7, at 4-5 [Defs.' Reply to Plfs.' Request for Admission, admitting referenced fact].)

[21]     (*Compare* Dkt. No. 13, Part 2, ¶ 6 [Plfs.' Rule 7.1 Statement, asserting referenced fact, which is supported by Dkt. No. 13, Part 7, ¶ 2] *with* Dkt No 15, at 22, ¶ 6 [Defs.' 7.1 Response, denying referenced fact, but not supporting that denial with accurate record citations]; *see also* Dkt. No. 15, at 12, 18-19, ¶¶ 3(t), 41(l) [Affidavit of Kenneth Orr, asserting referenced fact].)

[22]     (Dkt. No. 15, at 18-19, ¶ 41(l) [Affidavit of Kenneth Orr].)

[23]     (*Compare* Dkt. No. 13, Part 2, ¶ 7 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 22-3, ¶ 7 [Defs.' Rule 7.1 Response, admitting referenced fact]; *see also* Dkt. No. 15, at 12, 18-19, ¶¶ 3(u), 41(l) [Affidavit of Kenneth Orr, asserting referenced fact]; Dkt. No. 13, Part 9 [Photograph of Defs.' Clubhouse].)

[24]     (Dkt. No. 15, at 69-72 [Certificate of incorporation under Section 402 of the Not-for-Profit Corporation Law].)

various members of the Syracuse community who are both employed and ride motorcycles;[25]

21.     Currently, Defendants' motorcycle club has approximately 21 members;[26]

22.     At some point after January 29, 2001, Defendants hosted approximately 11 to 20 parties at Defendants' clubhouse, and pooled money to purchase and serve alcohol at those parties;[27]

23.     On or about January 30, 2005, a stabbing occurred near the premises where Defendants maintain their clubhouse;[28]

24.     On or about January 31, 2005, the Syracuse *Post-Standard* published an article about the stabbing;[29]

25.     On or about April 6, 2005, a shooting occurred near the premises where

---

[25]     (Dkt. No. 15, at 11, ¶¶ 3(m), 3(n) [Affidavit of Kenneth Orr, asserting referenced fact and adding that a member of Defendant 'Cuse Road Dawgs, Albert Thompson, is a Syracuse Police Officer].)

[26]     (Dkt. No. 15, at 11-12, ¶ 3(n) [Affidavit of Kenneth Orr].)

[27]     (Dkt. No. 15, at 12, ¶¶ 3(o), 3(q) [Affidavit of Kenneth Orr]; *see also* Dkt. No. 13, Parts 10-11 [attaching *Post-Standard* newspaper articles suggesting, or expressly stating, that parties occurring at premises in question].)

[28]     (*Compare* Dkt. No. 13, Part 2, ¶ 10 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 23, ¶ 13 [Defs.' Rule 7.1 Response, denying referenced fact, but providing record citation that controverted only whether the stabbing in question occurred "at" the club, and whether the victim of the stabbing had been a "guest" at the club, to the best of the affiant's knowledge].)

[29]     (*Compare* Dkt. No. 13, Part 2, ¶ 11 [Plfs.' Rule 7.1 Statement, asserting referenced, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 23, ¶ 11 [Defs.' Rule 7.1 Response, failing to deny referenced fact, and in any event failing to cite to portion of record actually controverting referenced fact]; *see* Dkt. No. 13, Part 10 [attaching copy of article].)

Defendants maintain their clubhouse;[30]

26.   On or about April 7, 2005, the Syracuse *Post-Standard* published an article about the shooting, reporting that the shooting was deadly, it occurred in a parking lot "next to" Defendants' clubhouse, and that alcohol had been consumed at their clubhouse on that particular evening without a liquor or bottle license;[31] and

27.   On or about July 29, 2005, Defendants obtained a liquor license for use at the their clubhouse.[32]

### C.   Facts Material to Both Marks and/or Clubs

28.   Defendants' mark uses a "stylized pit bull head" that is gold in color, while Plaintiffs' mark uses a "cartoon [depiction of the full body of a] bulldog" that is grey and white in color;[33]

---

[30]   (*Compare* Dkt. No. 13, Part 2, ¶ 12 [Plfs.' Rule 7.1 Statement, asserting referenced, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 23, ¶¶ 14-17 [Defs.' Rule 7.1 Response, denying referenced fact, but providing record citation that controverted only whether the shooting in question occurred "at" the club, and that in fact admitted that the victim had been a "guest" at the club that night, that alcohol had been purchased and consumed, and that the club did not have a liquor license at the time].)

[31]   (*Compare* Dkt. No. 13, Part 2, ¶ 13 [Plfs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 15, at 23, ¶¶ 11-17 [Defs.' Rule 7.1 Response, failing to deny fact that newspaper published referenced article, and in any event failing to cite to portion of record actually controverting fact that newspaper published referenced article]; *see* Dkt. No. 13, Part 10 [attaching copy of article].)

[32]   (*Compare* Dkt. No. 15, at 24, ¶ 15 [Defs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 16, Part 2, at 1, ¶ 15 [Plfs.' Rule 7.1 Response, admitting that Defs. obtained a liquor license on or about the referenced date, but denying that Defs. were properly authorized to distribute alcohol prior to that date]; *see also* Dkt. No. 15 at 12, ¶ 3(t) [Affidavit of Kenneth Orr].)

[33]   (*Compare* Dkt. No. 15, at 26, ¶ 42 [Defs.' Rule 7.1 Statement, asserting referenced fact, and supporting that assertion with accurate record citation] *with* Dkt. No. 16, Part 2, at 7, ¶ 42 [Plfs.' Rule 7.1 Response, either admitting referenced fact or failing to

29.     Defendants' mark places the words "'CUSE ROAD DAWGS" above the image of

the pit bull head, while Plaintiffs' mark places the words "ROAD DAWGS" above the image of

the bull dog with designation of the club chapter (such as the words "NEW YORK") below the

image of the bull dog;[34]

30.     Defendants' mark uses typed capital lettering of an unknown typeface, while

Plaintiff's mark typically uses typed capital lettering of a New Times Roman typeface;[35]

31.     Defendants' mark uses gold letters against a black background, while Plaintiffs'

mark typically uses gold letters against a white background;[36]

32.     Both Plaintiffs and Defendants have engaged in the following activities: (1)

representing their motorcycle clubs in the Syracuse area and on trips to several other states; and

(2) attending comparable social and charitable events;[37]

33.     Plaintiffs sell merchandise bearing their marks to both members and the public for

charitable fund-raising, while Defendants only (1) lease three "sew[-]on rockers" (bearing the

club's "colors") to "qualified members," (2) sell T-shirts to members, and (3) sell liquor at cost to

---

specifically deny referenced fact supported by accurate record citation]; *see also* Dkt. No. 15, at
15-16, ¶ 37 [Affidavit of Kenneth Orr].)

[34]     (*Id.*)

[35]     (*Id.*)

[36]     (*Id.*)

[37]     (Dkt. No. 15, at 97-100, 124-25, 128-29, 146, 157-58 [Deposition of Richard
Downey]; Dkt. No. 13, Part 7, ¶ 8 [Defs.' Reply to Plfs.' Request for Admission]; Dkt. No. 15, at
12, ¶ 3(p) [Affidavit of Kenneth Orr].)

members and guests.[38]

The Court notes that, because of the lack of a genuine issue of material fact created by the parties' cross-motions for summary judgment, and because Plaintiffs' motion requested a permanent injunction (rather than a preliminary injunction), the Court has found no need to hold an evidentiary hearing before deciding the parties' cross-motions.  *Beck v. Levering*, 947 F.2d 639, 641-42 (2d Cir. 1991).

## IV.   ANALYSIS OF PLAINTIFFS' MOTION

### A.   Plaintiffs' Claim Under Sections 1114(1) of the Lanham Act

Section 1114(1)(a) bars unauthorized use of a mark "in commerce . . . in connection with the sale, offering for sale, distribution, or advertising of any goods *or services* [if] . . . such use is likely to cause confusion . . . ."  15 U.S.C. § 1114(1)(a) (emphasis added).  "The term 'services' has been interpreted broadly."  *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 89 (2d Cir. 1997).  "As the court explained in *N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educ. Fund*, the right to enjoin infringement of a trade or service mark is as available to public service organizations as to merchants and manufacturers."  *United We Stand Am., Inc.*, 128 F.3d at 89 (citations omitted).  This is because "retention of a distinct identity by a non-profit organization that sells no goods is just as important as it is to a commercial company."  *Id.* (citing 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 9:5 [4th ed. 1996]).  "The protection of the trademark or service mark of non-profit and public service organizations requires that use of the mark by competing organizations be prohibited."  *Id.*  "The

---

[38]   (Dkt. No. 15, at 97-100, 124-25, 128-29, 146, 157-58 [Deposition of Richard Downey]; Dkt. No. 13, Part 7, ¶¶ 7, 8, 10, 12 [Defs.' Responses to Plfs.' Requests for Admission]; Dkt. No. 15, at 11, 12, 18, ¶¶ 3(h)-(j), 3(x), 4, 47(d) [Affidavit of Kenneth Orr].)

16

Lanham Act has thus been applied to [registrants] furnishing a wide variety of non-commercial public and civic benefits." *Id*. at 90 (collecting cases).

With that said, the success of a trademark infringement action under the Lanham Act depends on a showing of (1) the mark's validity and entitlement to protection, and (2) a likelihood of confusion. *See Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir. 1997) (citations omitted).

### 1.     Validity and Entitlement to Protection

With regard to the validity of Plaintiff's mark, "the fact that the USPTO accepted Plaintiffs' mark for registration creates a presumption that the mark is valid." *Lemme v. Nat'l Broad. Co., Inc.*, 472 F. Supp.2d 433, 442 (E.D.N.Y. 2007) (citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 [2d Cir. 2001]) (other citations omitted).  "Such registration constitutes prima facie evidence of Plaintiff's right to use the [mark] . . . ." *Id*. at 443.[39]  "The burden of production therefore shifts to Defendant[s] to proffer evidence that the mark is not valid, i.e., that it is [not entitled to protection]." *Id*.

With regard to the entitlement to protection of Plaintiff's mark, "[t]he degree to which a mark is entitled to protection under the Act depends on whether the mark is classified as (a) generic, (b) descriptive, (c) suggestive, or (d) fanciful or arbitrary." *The Gap, Inc.*, 108 F.3d at 1508 (citations omitted).  "The different categories of inherent distinctiveness have been

---

[39]     This presumption of validity is further supported by Plaintiffs' submission of the Trademark Electronic Search System results, which, among other things, indicates that Plaintiffs' mark was still "live" as of July 29, 2005.  (Dkt. No. 15, at 49 [TESS report submitted by Defs]; *cf.* Dkt. No. 13, Part 5, at 1, 2 [Trademark Application and Registration Retrieval Search ("TARR") submitted by Plfs., indicating that mark was registered and active as of March 30, 2007].)

described as follows:

> A generic term refers . . . to the genus of which the particular product is a
> species, e.g., 'Encyclopedia,' and is not entitled to trademark registration
> or legal protection.  A descriptive mark is one which conveys an
> immediate idea of the ingredients, qualities or characteristics of the goods,
> e.g., 'World Book' for an encyclopedia.  A suggestive mark is one that
> require[s] imagination, thought and perception to reach a conclusion as to
> the nature of the goods, e.g., Coppertone for suntan oil.  An arbitrary or
> fanciful mark is one that has no association with the particular product or
> service, e.g., 'Kodak' for photographic equipment.

*Lemme*, 472 F. Supp.2d at 440-41 (citing *Windsor, Inc. v. Intravco Travel Ctrs., Inc*., 799 F.

Supp. 1513, 1522 [S.D.N.Y. 1992]).

### a.    Classification of Marks Generally

### i.    Generic Marks

"Generic marks consist of 'words identifying the relevant category of goods or

services.'" *Lemme*, 472 F. Supp.2d at 441 (citing *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412

F.3d 373, 385 [2d Cir. 2005]) (other citations omitted).  "[A] mark is generic if, in the mind of

the purchasing public it does not distinguish products on the basis of source but rather refers to

the type of product." *Courtenay Commc'ns. Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003).

Generic marks "are not at all distinctive and thus are not protectable under any circumstances."

*Star Indus.*, 412 F.3d at 385; *see also TCPIP Holding Co., Inc. v. Haar Commc'ns., Inc*., 244

F.3d 88, 93 (2d Cir. 2001) ("[Generic marks] are not entitled to any protection against

infringement, even if they have become famous as marks, because according such protection

would deprive competitors of the right to refer to their goods by name.").  Having said that, "[i]t

is well established that a word may be generic of some things but not of others."  *Lemme*, 472 F.

Supp.2d at 441 n.2 (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 147 [2d

Cir. 1997]).  For example, "'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." *Id*. (citation and internal quotation marks omitted).

"Generic terms are not limited to nouns that directly name a product; instead, they may also be adjectives which name some distinctive characteristic of a genus of products." *Id*. at 441 (citations omitted).  "For example, the Seventh Circuit found 'Light Beer' and 'Lite Beer' to be generic names for a type of beer light in body or taste or low in alcoholic or caloric content." *Id*. (citing *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79-81 [7th Cir. 1977]). "In this regard, the Trademark Board has said that a term which does not directly name a product but names the most important purpose of the product is a type of 'generic adjective' which is a generic name." *Id*. (internal quotation marks and citations omitted).

### ii.     Descriptive Marks

"Descriptive marks are those consisting of words identifying qualities of the product." *Lemme*, 472 F. Supp.2d at 441 (internal quotation marks and citations omitted).  "A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." *Id*. (citing *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc*., 192 F.3d 337, 344 [2d Cir. 1999]) (other citations omitted).  "Descriptive marks are not inherently distinctive, but are protectable when they acquire 'secondary meaning,' . . . i.e., they identify the source of the product rather than the product itself . . . ." *Id*. at 442 (internal quotation marks and citations omitted).

### iii.     Suggestive Marks

"Suggestive marks are inherently distinctive."  *Lemme*, 472 F. Supp.2d at 442 (citations

omitted).  "Suggestive marks are those that are not directly descriptive, but do suggest a quality

or qualities of the product, through the use of imagination, thought and perception."  *Star Indus*.,

412 F.3d at 385 (citation and internal quotations marks omitted).

### iv.     Arbitrary and Fanciful Marks

"Arbitrary or fanciful marks are ones that do not communicate any information about the

product either directly or by suggestion."  *Star Indus*., 412 F.3d at 385.  "Arbitrary means that

the ordinary meaning of the word is applied in an arbitrary and non-descriptive sense."  *Lemme*,

472 F. Supp.2d at 442 (citing *McCarthy on Trademarks* § 11:11 at 11-18).  "A fanciful mark is a

name that is made-up to identify the trademark owner's product like EXXON for oil products and

KODAK for photography products."  *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d

1072, 1075-76 (2d Cir. 1993).  "Both arbitrary and fanciful terms are always entitled to

trademark protection.  *Lemme*, 472 F. Supp.2d at 442 (citation omitted).

### b.     Classification of Plaintiffs' Mark

In their motion papers, Defendants argue that Plaintiffs' "Road Dawgs" mark is not

entitled to protection because it is merely generic.  Alternatively, Defendants argue that they are

entitled to certain statutory defenses.

### i.     Whether Plaintiffs' Mark Is Generic

"The classification of a mark is a factual question [which turns on] how the purchasing

public views the mark."  *Lane Capital Mgm't*, 192 F.3d at 344.  "Nonetheless, summary

judgment is as appropriate in trademark cases as any other where there are no material disputes

20

of fact." *Lemme*, 472 F. Supp.2d at 443 (citations omitted).

With this in mind, the Court concludes that Plaintiffs' mark "ROAD DAWGS" is not generic. The Courts reaches this conclusion because the mark 'ROAD DAWGS' "makes no reference whatsoever to the nature of the goods it designates." *Lemme*, 472 F. Supp.2d at 443. Simply put, the phrase, without more, does not imply a motorcycle club with membership limited to law enforcement officials. *See Lemme*, 472 F. Supp.2d at 443; *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (holding that "Wet Ones" is suggestive and stating: "Wet Ones, like Wite-Out, could plausibly describe a wide variety of products."); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 144 (2d Cir. 1997) ("In order to become generic the principal significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin.") (citation and internal quotations marks omitted); *cf. Reese Publ'g. Co. v. Hampton Int'l Commc'ns., Inc.*, 620 F.2d 7 (2d Cir. 1980) (finding "Video Buyers Guide" to be generic).

        **ii.**       **Whether Plaintiffs' Mark Is Descriptive or Suggestive**

Having found that the mark is not generic, the next question becomes whether the term "ROAD DAWGS" is descriptive or suggestive of the motorcycle club. Neither party has addressed this issue in their motions papers. Defendants' papers presume that the term is either generic or descriptive (with no secondary meaning) and thus not entitled to any protection. Plaintiffs merely proclaim that their mark is entitled to protection because a weighing of the *Polaroid* factors supports a finding that there is a likelihood of confusion between the marks. Such a proclamation does not assist the Court in making its determination on the issue of whether Plaintiffs' mark is descriptive or suggestive.

"The descriptive-suggestive distinction is hardly a clear one." *See Lemme*, 472 F. Supp.2d at 444 (citing *McCarthy on Trademarks* § 11:66 at 11-127). "The Second Circuit has articulated the following guidelines to assist courts in making this distinction":

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. . . .  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods. . . .
>
> An illuminating explanation of the difference between a descriptive mark that conveys an idea of the characteristics of the product and a suggestive one that requires imagination to divine the nature of the product is that[,] if there is an imaginative factor connecting the name and the product . . . [,] then the name is suggestive.

*Id*. (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73-74 [2d Cir. 1988]) (other citations and internal quotation marks omitted).

Applying these principles to the current case, the Court concludes that "ROAD DAWGS" is suggestive in that an ordinary consumer would not immediately connect "ROAD DAWGS" with a motorcycle club–much less a motorcycle club exclusively for law enforcement officials. *See Id*. ("If the mental leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness.") (citing *McCarthy on Trademarks* § 11:67 at 11-129-11-130).  Defendants attempt to persuade the Court that the term is merely descriptive by submitting the affidavit of Defendants' attorney, who states that (1) "[a]n internet search shows" that the term "road dawgs" generates 450,000 internet hits,[40] and (2) an online slang-dictionary definition, offered by a woman identified as "Stacy,"

---

[40]      Setting aside the fact that defense counsel improperly asserts a legal argument in an affidavit (in violation of Local Rule 7.1[a]), and the issue of whether he is improperly attempting to serve as a witness on a motion for summary judgment, the Court notes that defense counsel has failed to specify what search engine he used to conduct his internet search.

defines "road dawg" as a travel companion and a best friend.[41]  (Dkt. No. 15, at 5-6.)

As an initial matter, the fact that the term "road dawgs" generates a number of internet hits is not dispositive of the issue of whether the mark is descriptive or suggestive.  This is because the term may be descriptive in some contexts and suggestive in others.  Moreover, the slang definitions of the phrase in question "are not sufficiently consistent so as to suggest that an ordinary consumer confronted with the term ["ROAD DAWGS"] would immediately sense the identical thing, much less perceive the characteristics of Plaintiffs' [motorcycle club]."  *See Lemme*, 472 F. Supp.2d at 444.[42]

"This conclusion is further borne out by Defendant['s'] proffer regarding the multitude of . . . [groups or teams], and other services and goods which have used ["ROAD DAWGS"] in their titles."  *See Lemme*, 472 F. Supp.2d at 444.[43]  Moreover, even assuming, for the sake of

---

[41]    Pursuant to Fed. R. Evid. 201, the Court takes judicial notice of the fact that other slang dictionaries define "road dawg" as (1) "a term of endearment among friends," (2) "a friend one spends a great deal of time with," or (3) "a running partner."  *See* Randy Kearse, *Street Talk: Da Official Guide to Hip-Hop and Urban Dictionaruy* at 470 (Barricade Books 2007); UrbanDictionary.com, http://www.urbandictionary.com/define.php?term=road+dawgs [last visited Sept. 21, 2009]; *cf.* Tom Dalzell, *The Routledge Dictionary of Modern American Slang and Unconventional English* at 819 (Routledge 2008) (defining "road dog" as "an extremely close friend"); Alonzo Westbrook, *Hiphoptionary TM: The Dictionary of Hip Hop Terminology* at 116, 180 (Harlem Moon 2002) (defining "road dog" as "a travel partner" or "a hanging buddy").

[42]    *See*, *supra*, note 41 of this Second Amended Decision and Order (collecting various definitions).

[43]    (*See* Dkt. No. 15, at 6, ¶ 44 [Decl. of Woodruff Carroll, admitting that the term "Road Dawgs" has been adopted by numerous types of groups other than motorcycle clubs].) Because Plaintiff does not question the fact that the term "Road Dawgs" has been adopted by numerous types of groups other than motorcycle clubs, the Court takes judicial notice of newspaper articles referring to "Road Dawgs" as the name of (1) a running club in Fort Worth, Texas, (2) a running group in Munford, Tennessee, (3) a youth basketball team in San Jose, California, and (4) a softball team in Chicago, Illinois.  *See* Debbie Fetterman, "Michigan Runner Enjoys Being Athletically Incorrect," *The Dallas Morning News* at 15B (Dec. 4, 1999);

argument, that the term "ROAD DAWGS" conjured up general (and even somewhat related) ideals in the minds of an average consumer pertaining to motorcycle clubs, the term does not sufficiently describe the "particular [club] itself or its differentiating qualities." *Id.* at 445 (finding that term "GUNG-HO" was suggestive rather than descriptive of a toy action figure of a Marine sergeant because "a certain amount of creative imagination is required" of the child to intuit the specific attributes of this particular character from its mark) (citing *Hasbro*, 858 F.2d at 75); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1379 n.4 (2d Cir. 1993) ("The TWIN PEAKS mark is at least suggestive and not merely descriptive.  TWIN PEAKS neither literally describes the television program nor describes the purpose or utility of the product."); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 687 F.2d 563, 566-67 (2d Cir.1982) (holding that term "PLAYBOY" was suggestive because, although term "may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents"). Rather, connecting general ideals of "best friends" and "travel companions" to an exclusive motorcycle club "requires some imagination and it is this need to resort to imagination that renders ["ROAD DAWGS"] suggestive rather than descriptive."  *See Lemme*, 472 F. Supp.2d at 445 (internal quotation marks and citations omitted).

As a result, based on the current record, the Court holds that "ROAD DAWGS" as used by Plaintiffs in relation to their law enforcement-only motorcycle club is a suggestive mark.

---

Brent Manley, "A Good Day for Running," *The Commercial Appeal* at M1 (June 1, 2009); "Local Events," *The Mercury News* at L1 (June 19, 2006); Tara Malone, "Not Just a Summer Sport," *Chicago Daily Herald* at 3 (Feb. 8, 2004).

c.      Contestability

Pursuant to 15 U.S.C. § 1065, a mark is incontestable when the mark has been used "in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce . . . [p]rovided, that, [*inter alia*,] there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of . . . . 15 U.S.C. § 1065.[44]  When a mark attains incontestable status, the law treats such status as conclusive evidence of a mark's validity and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce.  *See* 15 U.S.C. § 1115(b); *accord, Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986) (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193-94 [1985]).

If a mark is deemed to be incontestable, then the defendant must assert one of the defenses set forth in 15 U.S.C. §§ 1115(b)(1)-(9) to overcome the incontestable status of a mark. *Lois Sportswear, U.S.A., Inc.*, 631 F. Supp. at 740.  Moreover, even if a mark is deemed to be contestable, then the defendant may still assert one of the defenses set forth in 15 U.S.C. §§ 1115(b)(1)-(9), in order to try to overcome the incontestable status of a mark.  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 105 S. Ct. 658, 662-63 (1985) (citing 15 U.S.C. § 1115[a]) ("The Lanham Act expressly provides that before a mark becomes incontestable an opposing party may prove any legal or equitable defense which might have been asserted if the mark had not been

_____

[44]      The Court notes that there are other exceptions to 15 U.S.C. § 1065 which are not applicable in the current action, and are therefore not discussed by the Court.

25

registered.").  In the event the defendant cannot raise or is not entitled to one of those defenses, then protectability is established and the success of the plaintiff's claim depends upon a showing of a likelihood of confusion.  *Lois Sportswear, U.S.A., Inc.*, 631 F. Supp. at 740.

Here, the Court finds that whether Plaintiff's mark is incontestible depends on whether, within five years of the date of the mark's registration on October 3, 2000, there was filed a "proceeding involving said rights . . . in a court and not finally disposed of" pursuant to 15 U.S.C. § 1065.  More specifically, the issue turns on whether the current action–which was filed on August 2, 2005–qualifies as such a proceeding.

Although the parties have not briefed this issue, the Court has discovered several cases indicating that the language of 15 U.S.C. § 1065 applies to proceedings in which a plaintiff challenges a party's use of a similar mark.[45]  Based on these cases, as well as the fact that Defendants may assert equitable defenses regardless of the answer to this issue, the Court will assume, for the sake of Plaintiffs' motion for summary judgment, that their mark is contestable due to the filing of this action within five years of the mark's registration on October 3, 2000.

---

[45]     *See Verilux, Inc. v. Hahn*, 05-CV-0254, 2007 WL 2318819, at *4 n.3 (D. Conn. Aug. 10, 2007) ("Plaintiff's SUNSHINE IN A BOX, SUNSHINE SIMULATOR, and SUNSHINE IN A LAMP marks . . . have been registered since August 2000, May 2005, and July 2003, respectively.  Plaintiff filed this action in February of 2005.  Therefore, Plaintiff's marks are not incontestable because at the time it filed this action, none of its marks had been registered for five years or more."); *Guaranty Residential Lending, Inc. v. Homestead Mortg. Co., L.L.C.*, 04-CV-74842, 2005 WL 4927827, at *4 (E.D. Mich. Dec. 13, 2005) ("Since 'Homestead Mortgage' was registered in 1996 and Plaintiffs/Counter-Defendants did not bring the original action until 2004, more than five years have lapsed, making the mark incontestable under Wynn."); *First Interstate Bancorp v. Stenquist*, 89-CV-4106, 1990 WL 299251, at *2 (N.D. Cal. Dec.12, 1990) ("Plaintiff Bancorp first registered the 'First Interstate Bank' mark with the United States Patent and Trademark Office on September 11, 1984.  Plaintiff had continuously used the name for five consecutive years prior to the filing of this action on November 17, 1989.  Therefore, plaintiff's rights had become incontestable, and the valid federal registration is conclusive evidence of plaintiff's exclusive right to use the mark.").

26

Because Defendants have asserted some of the equitable defenses set forth in 15 U.S.C. § 1115(b), the Court must now evaluate the merits of those defenses, and, if necessary, consider whether those defenses are capable of undermining the protectability of Plaintiffs' mark.

### d.    Equitable Defenses

The defenses to the statutory presumptions on the issue of protectability are listed in 15 U.S.C. §§ 1115(b)(1)-(9).  The three relevant defenses (asserted by Defendants) include the following: (1) their defense "[t]hat the registered mark is being used by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used;[46] (2) their defense "[t]hat the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title";[47] and (3) their defense that "[t]hat equitable principles, including laches, estoppel, and acquiescence, are applicable.[48]

---

[46]    *See* 15 U.S.C. § 1115(b)(3).

[47]    *See* 15 U.S.C. § 1115(b)(5).

[48]    *See* 15 U.S.C. § 1115(b)(9).

###### i.        Defendants' First and Third Defenses

As a preliminary matter, the Court notes that Defendants' first and third defenses–i.e., their defenses arising under § 1115(b)(3) and § 1115(b)(9)–overlap because Defendants essentially assert, in their acquiescence argument, that Plaintiffs gave them permission to use their mark.  Accordingly, the Court will analyze these defenses together.

The equitable principle of laches may be raised in a trademark infringement action if the infringing user shows an unreasonable delay by the registrant in the assertion of its rights to its mark, or an intent by the registrant to abandon use of that mark.  *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 21 (1900).  More specifically, a party seeking to prevail under a defense of laches must show: "(1) that the trademark owner had knowledge of the party's use of its mark; (2) that the owner inexcusably delayed in taking action with respect thereto; (3) that the party will be prejudiced by permitting the owner inequitably to assert its right at this time; and (4) good faith conduct on the part of the using party."  *Fusco Group, Inc. v. Loss Consultants Intern., Inc.*, 462 F. Supp.2d 321, 329 (N.D.N.Y. 2006) (Kahn, J.) (citing *McDonald's Corp. v. Druck & Gerner, P.C.*, 814 F. Supp. 1127, 1136 [N.D.N.Y. 1993] [Scullin, J.]) (other citations omitted).  In addition, "[a] mere delay will not, by itself, bar a plaintiff's suit, but that there must be some element of estoppel, such as reliance by the defendant."  *Fusco Group, Inc.*, 462 F. Supp.2d at 329 (citations omitted).  Finally, "[a] party asserting an equitable defense such as laches must demonstrate that it comes before the court with clean hands."  *Eppendorf-Netheler-Hinz GMBH v. Nat'l Scientific Supply Co., Inc.*, 14 F. App'x. 102, 105 (2d Cir. July 13, 2001).

The equitable principle of estoppel may be raised in a trademark infringement action if

28

the infringing user shows that "(1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit." *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp.2d 247, 276 (S.D.N.Y. 2002) (citation omitted).

The equitable principle of acquiescence may be raised in a trademark infringement action if the conduct of the plaintiff amounts to an express or implied assurance that plaintiff will not assert its rights, as a trademark registrant, against the infringing user. *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407 (2d Cir. 1917); *Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.*, 867 F. Supp. 175, 187 (S.D.N.Y. 1994) ("Acquiescence is an equitable defense whereby relief may be denied a trademark owner who has, by word or deed, expressed consent to the defendant's use of its mark.") (citations omitted).

If properly raised, any one of these three defenses may undermine the protectability of a registered mark.  However, if the record reveals that the defenses are not available to a particular party and that party fails to produce additional evidence relating to the issue of protectability, then the registered mark is entitled to protection.

In support of their assertion of the defenses of laches and acquiescence, Defendants rely on an alleged incident that occurred in June 2001 at Americade, a national motorcycle event, during which Defendants allege that Plaintiffs' President and CEO indicated knowledge of Defendants' existence.  (Dkt. No. 15, at 33.)  Defendants argue that Plaintiffs' failure to assert their right to the "ROAD DAWGS" mark until April 5, 2005, despite having knowledge of Defendants' use of the mark since at least June 2001, constitutes laches and/or acquiescence.

29

(*Id.*)  In response, Plaintiffs argue that the evidence offered by Defendants in support of their assertion of these equitable defenses is inadmissible hearsay within hearsay, which cannot be considered by the Court at the summary judgment stage.  (Dkt. No 16, Part 1, at 4-5.)

Plaintiffs are correct that, at the summary judgment stage, "[a] Court may not consider . . . hearsay testimony . . . ."  *See* Fed. R. Civ. P. 56(e) (providing that, when affidavits are used to support or oppose a motion for summary judgment, they "shall . . . set forth such facts as would be admissible in evidence"); *Smith v. Stone & Webster Eng'g Corp.*, 86-CV-5627, 1988 WL 32928, at *4 (S.D.N.Y. Apr. 4, 1988).[49]  Moreover, Plaintiffs are correct that the statements described within Michael Harper's affidavit, which were made by an unnamed person acting in an unknown capacity and/or with unknown authority, are inadmissible hearsay under Rules 801 through 805 of the Federal Rules of Evidence.[50]

Moreover, the above-described defect in Mr. Harper's affidavit relates to another fatal defect contained in that affidavit: the crux of the affidavit is based upon statements by an unnamed person on an unspecified date and time in early June 2001, at an unspecified place in or around Lake George, New York.[51]  This defect is exacerbated by the fact that the assertions

---

[49]     Hearsay is a statement, made by someone other than the declarant, offered to prove the truth of the matter asserted.  Fed. R. Evid. 802.

[50]     (*See* Dkt. No. 15, at 21 [Affidavit of Michael Harper, claiming that he "met a founder and president of the USA Road Dawgs at Americade in 2001," who stated that he had "heard of" the 'Cuse Road Dawgs, and offered to have the 'Cuse Road Dawgs ride with the Road Dawgs "sometime"].)

[51]     *See Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) ("[A] court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay *or make generalized and conclusory statements*.") (emphasis added), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000).

contained in the self-serving affidavit are undermined by the record, which indicates that (1) there was no national president of Road Dawgs until 2003, (2) the current national president of Road Dawgs (Richard Downey) first became aware of Defendants in November 2004, after the president of Plaintiffs' Syracuse chapter contacted him and told him that there had been a fatal stabbing at the 'Cuse Road Dawgs clubhouse, and (3) after that conversation, the president of the Syracuse Chapter contacted Defendants' president, informing Defendants' president that "Road Dawgs" is "a trademarked organization," and that Defendants should therefore cease using the name 'Cuse Road Dawgs.  (Dkt. No. 15, at 110-111, 130-32.)  For each of these reasons, Michael Harper's affidavit is rejected and stricken from the record.[52]

---

[52]     For the sake of brevity, the Court will overlook the fact that affidavit is neither properly notarized nor sworn to under the penalty of perjury pursuant to 28 U.S.C. § 1746.  *See* Dkt. No. 15, at 21.)  *See* N.Y. Exec. Law § 137 ("In exercising his powers pursuant to this article, a notary public, in addition to the venue of his act and his signature, shall print, typewrite, or stamp beneath his signature in black ink, his name, the words 'Notary Public State of New York,' the name of the county in which he originally qualified, and the date upon which his commission expires and, in addition, wherever required, a notary public shall also include the name of any county in which his certificate of official character is filed, using the words 'Certificate filed . . . . . . County.'"); *Ty, Inc. v. MJC-A World of Quality, Inc*., 93-CV-3478, 1994 WL 36880, at *2 (N.D. Ill. Feb. 8, 1994) (striking two affidavits from the record which substituted the phrase  "under oath" for "under penalty of perjury" because "[a]bsent any reference to law or to the penalty for perjury, or the proper indication that an oath was actually taken before an authorized agent of the court, it is not clear that affiants making statements outside of court will fully appreciate the consequences or be impressed with the solemnity of their declarations."); *Tackman v. Goord*, 99-CV-0438, 2005 WL 2347111, at *26-27 (W.D.N.Y. Sept. 26, 2005) ("A document's qualification as an affidavit is not determined by the presence or absence of the stamp or seal of a notary.  Rather, the statement may properly be considered in opposition to summary judgment provided the proffered statement conforms to the requirements of 28 U.S.C. § 1746.  A writing that does not contain the exact language of 28 U.S.C. § 1746 will not be disregarded provided it substantially complies with these statutory requirements, which is all that this Section 1746 requires. . . . [However, an affidavit] may not be considered in opposition to Defendants' summary judgment motion . . . [if the affiant] has not subjected himself to the penalties for perjury should it ultimately be determined that the statements contained therein are false.").

With regard to defense counsel's affidavit, the Court finds this affidavit to be inadmissible as well.  Rule 56 of the Federal Rules of Civil Procedure requires that, when affidavits are used to support or oppose a motion for summary judgment they, "shall be made on personal knowledge, and shall set forth such facts that would be admissible in evidence."  Fed. R. Civ. P. 56(e)(1); *see also* N.D.N.Y. L.R. 7.1(a)(3).  Mr. Carroll's affidavit makes the same assertion as does Michael Harper's affidavit–i.e., that "they knew we existed in 2001 and did nothing."[53]  However, Mr. Carroll does not have personal knowledge of what Plaintiffs knew in 2001 (nor would he likely be able to relate such personal knowledge, if he had it, without impermissibly becoming a witness in this lawsuit).[54]  Therefore, the Court hereby strikes Paragraph 64 of Mr. Carroll's affidavit.[55]

Because the equitable defenses asserted by Defendants are premised upon Mr. Harper's and Mr. Carroll's affidavits, and because the relevant portions of those affidavits have been stricken from the record, the Court rejects Defendants' assertion of those equitable defenses.

---

[53]    (Dkt. No. 15, at 8.)

[54]    *See* N.D.N.Y. L.R. 7.1(a)(3) ("The record [on a summary judgment motion] . . . does not . . . include attorney's affidavits."); N.Y. Rule of Professional Conduct 3.4(d)(2),(3) ("A lawyer shall not . . . in appearing before a tribunal on behalf of a client . . . assert personal knowledge of fact in issue except when testifying as a witness . . . [or] assert a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused . . . ."); N.Y. Rule of Professional Conduct 3.7(a) ("A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless: (1) the testimony relates solely to an uncontested issue; (2) the testimony relates solely to the nature and  value of legal services rendered in the matter; (3) disqualification of the lawyer would work substantial hardship on the client; (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or (5) the testimony is authorized by the tribunal.").

[55]    The Court notes that the paragraph is numbered, by mistake, "54," but is situated between paragraphs "63 " and "65."

*Moreover, even assuming, for the sake of argument, that the Court were to consider Mr.*
*Harper's affidavit, the Court would nonetheless find that this evidence is not sufficient to raise a*
*question of fact with regard to the availability of equitable defenses for two reasons.*

First, the equitable defense of acquiescence has three elements: "(1) the senior user
actively represented that it would not assert a right or claim; (2) the delay between the active
representation and assertion of the right or claim was not excusable; and (3) the delay caused the
defendant undue prejudice." *Audi AG v. Shokan Coachworks, Inc.,* 592 F. Supp.2d 246, 263
(N.D.N.Y. 2008) (McCurn, J.) (rejecting a defense of acquiescence because defendant exceeded
the permitted scope of use for the plaintiff's mark). As for the second element (i.e., the existence
of an excuse for the delay between the active representation and assertion of the right or claim), a
delay is excusable if a defendant's encroachment on a plaintiff's registered mark was
progressive. Thus, even if a plaintiff sleeps on his rights (or gives the defendant passive or
express permission to use a mark), the plaintiff can later assert his right if "something about the
defendant's use of the mark [has] changed significantly." *Norton Corp. v. ST Microelectronics*,
305 F.3d 397, 410 (6th Cir. 2002); *Kellogg, Co. v. Exxon Corp.*, 209 F.3d 562, 573 (6th Cir.
2000) (applying a progressive encroachment analysis to the plaintiff's 31-year delay in asserting
its trademark rights). Here, the change in usage consisted of Defendants' change from merely
attending Americade in 2001 to their having newspaper articles published about crimes
occurring at or near their premises (regardless of whether the newspaper articles were accurate).
This change was significant because Plaintiffs' club prides itself on being made up of law

enforcement officials.[56]  In addition, the Court finds that, based on the current record, Defendants have not shown that they suffered any real harm or prejudice because of Plaintiffs' delay in asserting their rights.[57]

Second, even assuming that Plaintiffs passively consented to Defendants' use of the mark in 2001, Defendants are not entitled to the equitable defense of laches.  No specific timetable governs the application of the laches doctrine to a trademark case.  Rather, the basis for applying the doctrine hinges on whether the delay in asserting ownership of a mark was reasonable. *Saratoga Vichy Spring Co., Inc. v. Lehman,* 491 F. Supp. 141, 154 (N.D.N.Y. 1979) (Foley, J.) (citing *Saxlehner*, 179 U.S. at 19).  In determining the reasonableness of a senior user's delay, a court must weigh six factors: "(1) the strength and value of the mark; (2) plaintiff's diligence in the enforcement of his rights; (3) the harm to the plaintiff if relief is denied; (4) the good faith of the defendant; (5) the competitiveness of the parties; and (6) the harm to the defendant occasioned by the delay." *Saratoga Vichy Spring Co., Inc.,* 491 F. Supp. at 154 (citing *Chandon*

---

[56]     The Court notes that, in its coverage of the stabbing that occurred near Defendants' club, the media used *Plaintiffs'* name by mistake.  (Dkt. No. 13, Part 10 [newspaper article]; Dkt. No. 15, at 131 [Deposition of Richard Downey].)  The Court notes also, that in its coverage of the deadly shooting that occurred near Defendants' club, the media used Defendants' name once, and then Plaintiffs' name four times.  (Dkt. No. 13, Part 11 [newspaper article].)

[57]     Because Defendants are a non-profit entity, the only additional prejudice that they could have suffered due to Plaintiffs' delay would be the reliance of their members on the use of Plaintiffs' mark.  Although Defendants list their members' names and allege that certain members obtained tattoos of the name "'Cuse Road Dawgs" on their bodies (Dkt. 15 at 11-15), Defendants provide no proof that their members obtained these tattoos during Plaintiffs' delay or in reliance of Plaintiffs' delay.  In fact, it appears that Defendants' members obtained these tattoos in March of 2005–approximately five months after Plaintiffs requested that they stop using the mark in November 2004.  (Dkt. 15 at 32, 130-132.)  Simply stated, even assuming Plaintiffs were aware of Defendants' use of the "'Cuse Road Dawgs" mark in 2001, there is no evidence to show that Defendants' members would have suffered less harm had Plaintiffs asserted their right immediately after Plaintiffs became aware of Defendants' infringing use.

*Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 [2d Cir. 1964]).

Just as Plaintiffs' delay in asserting their mark was excusable under the acquiescence framework, the Court also finds that Plaintiffs' delay was reasonable under the laches analysis, based on a careful weighing of the above-described six factors.  For example, the record establishes that, once they became aware of the significant change in Defendants' usage of Plaintiffs' mark, Plaintiffs promptly and diligently asserted their right to their mark in an effort to avoid being associated with Defendants.  (Dkt. No. 15, at 131-32 [Deposition of Richard Downey, stating that the president of Plaintiffs' Syracuse based chapter contacted Defendants' president in November 2004 and told him that Defendants must stop using the name "'Cuse Road Dawgs" because "Road Dawgs" was trademarked]).  Moreover, the record establishes that Defendants have not shown that they suffered any real harm or prejudice because of Plaintiffs' delay in asserting their rights (*see*, *supra*, note 57 of this Second Amended Decision and Order).

For all of these reasons, Defendants' assertion of equitable defenses is rejected.

### ii.        Defendants' Second Defense

With regard to Defendants' second defense–i.e., their defense arising under § 1115(b)(5)– Defendants have created a genuine issue of material fact as to whether, when they adopted the mark in question on or about August 21, 1999, they had knowledge of Plaintiffs' prior use of the mark.  Moreover, Defendants have adduced admissible record evidence that, since August 21, 1999, they continuously used the mark in question prior to when Plaintiffs obtained a registration of their mark on October 3, 2000.[58]  As a result, Defendants have created a genuine issue of

---

[58]        In addition, the Court notes that Defendants have adduced admissible record evidence that, since August 21, 1999, they continuously used the mark in question prior to when the parties agree that Plaintiff's mark was first published on November 30, 1999.  (*Compare* Dkt.

material fact as to whether they are entitled to the defense established by 15 U.S.C. § 1115(b)(5).

However, this does not end the Court's inquiry.  This is because "[i]t is an aboriginal axiom of trademark law that innocent adoption of an infringing mark is no defense to an action for infringement." *Jeffrey Craig, Ltd. v. Ithaca Ind., Inc*., 85-CV-2576, 1985 WL 3394, at *4 (S.D.N.Y. Oct. 23, 1985).[59]  "Surely Congress, in enacting § 1115(b)(5), did not intend to change this fundamental principle *sub silentio*." *Jeffrey Craig, Ltd.*, 1985 WL 3394, at *4.  "Instead it appears clear that it intended only what the words of the statute expressly provide: that in an action against one who in good faith commenced continous [sic] use of the allegedly infringing mark before the registered mark was published, the incontestability of the registered mark is not conclusive evidence of the registrant's right to exclusive use of the mark." *Id.*[60]  "This does not mean that the infringement suit must be dismissed." *Jeffrey Craig, Ltd.*, 1985 WL 3394, at *4.  "It merely means that the registrant must prove its right to exclusive use by establishing its ownership of the mark and its priority of use as well as the likelihood of confusion of customers

---

No. 13, Part 5, at 2 *with* Dkt. No. 15, at 32.)

[59]     *See also* 3A R. Callman & L. Altman, *The Law of Unfair Competition Trademarks and Monopolies* § 20.49, at 289 (4th ed. 1983) ('The absence of malicious intent or bad faith on the defendant's part furnishes no defense to a trademark infringement. . . . [E]ven if a competitor, in all innocence, makes the unhappy choice of an infringing trademark, he should at least be subject to an injunction.").

[60]     *See also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc*., 105 S. Ct. 658 (1985) (reviewing at considerable length the purpose and legislative history of § 1115(b) and pointing out that the congressional sponsor of the Lanham Trademark Act of 1946 had specifically explained the effect of the defenses enumerated in that section: "Representative Lanham made his remarks to clarify that the seven defenses enumerated in § 33(b) are not substantive rules of law which go to the validity or enforceability of an incontestable mark. Instead, the defenses affect the evidentiary status of registration where the owner claims the benefit of a mark's incontestable status.  If one of the defenses is established, registration constitutes only prima facie and not conclusive evidence of the owner's right to exclusive use of the mark.").

36

through defendant's use of the mark." *Id.*

For these reasons, the Court must proceed to an analysis of whether Plaintiffs have proved their right to exclusive use by establishing a likelihood of confusion of customers through Defendants' use of their mark.[61]

## 2.        Likelihood of Confusion

In evaluating a likelihood of confusion, "a probability of confusion, not a mere possibility, must exist." *Twin Peaks Prods.*, 996 F.2d at 1379; *see also Playtex Prods., Inc.*, 390 F.3d at 161.  A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998).  "In determining whether or not there is a likelihood of confusion, courts in the Second Circuit apply the eight factors set forth by Judge Henry J. Friendly in the decision of *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961):

> (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and

---

[61]        As discussed in Part III of this Second Amended Decision and Order, Plaintiffs began using their mark before Defendants, and "the exclusive right to the use of the mark or device claimed as a trade-mark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production." *Columbia Mill Co. v. Alcorn*, 150 U.S. 460, 463-64 (1893), *accord Plasmart, Inc. v. Wincell Intern. Inc.*, 442 F. Supp.2d 53, 60 (S.D.N.Y. 2006).  In addition, as discussed in Part IV.A.1. of this Second Amended Decision and Order, Plaintiffs' mark is valid.  Finally, Plaintiffs' mark is registered, and registration provides a legal presumption of the registrant's ownership and exclusive right to use the mark in connection with the goods or services listed in the registration.  15 U.S.C. § 1115(a).  As a result, Plaintiffs have already demonstrated ownership of their mark and their priority of use.

(8) the sophistication of the relevant consumer group.

*Lemme*, 472 F. Supp.2d at 446 (citing *Playtex Prods., Inc*., 390 F.3d at 162 [quoting *Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492, 495 (2d Cir. 1961)]).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Playtex Prods., Inc*., 390 F.3d at 162 (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 [2d Cir. 2000]). "In general, no single factor should be treated as dispositive." *Lemme*, 472 F. Supp.2d at 446. Furthermore, the evaluation of the Polaroid factors is not "a mechanical process by which the party with the greatest number of factors wins." *Id*. (citation omitted). "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused. " *Id*. (internal quotation marks and citations omitted).

### a.    Strength of Plaintiffs' Mark

The parties dispute the strength of Plaintiffs' mark.[62] "The strength of a mark is determined by its tendency to uniquely identify the source of the product." *Star Indus., Inc.,* 412 F.3d at 384. "This tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired secondary meaning." *Id.* (citation omitted). "Determination of strength therefore begins with inquiry as to whether the mark has the inherent distinctiveness that would entitle it to protection in the absence of secondary meaning." *Id.* (noting that "[m]arks are classified, in ascending order of strength, as generic, descriptive, suggestive, or arbitrary or fanciful.").

---

[62]    (*Compare* Dkt. No. 15, at 30 [Defs.' Memo. of Law] *with* Dkt. No. 13, Part 12, at 6 [Plfs.' Memo. of Law].)

"Once a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question." *Id*. at 385 (citations omitted). "[I]f a mark is registered and, thus, afforded the utmost degree of protection, the presumption of an exclusive right to use the mark extends only so far as the goods or services noted in the registration certificate." *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004)

Plaintiffs' mark is registered and thus is presumptively strong as applied to the goods and services listed on the registrations, namely: a motorcycle club.[63]  Moreover, Plaintiffs assert that the consuming public, and in particular, motorcyclists and motorists (those in the relevant marketplace), associate Plaintiffs' mark with law enforcement officials;[64] and Defendants have failed to offer any evidence that would undermine this assertion.[65]  As a result, the Court concludes that this factor weighs in favor of finding a likelihood of confusion between the marks.

### b.    Similarity Between Parties' Marks

The similarity factor analyzes the degree of resemblance in appearance, sound and

---

[63]    (Dkt. No. 13, Part 4, at 3.)

[64]    (Dkt. No. 13. Part 13. at 4, ¶ 1.)

[65]    Although Defendants have offered evidence that Plaintiffs' mark has a slang definition and is commonly used in society, Defendants have failed to offer any evidence that would suggest that, within the motorcycle industry/community, "ROAD DAWGS" is not commonly associated with Plaintiffs' club.  The Court takes judicial notice of the fact that at least one online slang dictionary appears to associate "road dawg" with Plaintiffs' club chapter in Florida.  *Urban Dictionaruy* at 470 (Barricade Books 2007); UrbanDictionary.com, http://www.urbandictionary.com/define.php?term=road+dawgs [last visited Sept. 21, 2009];

meaning between the marks at issue.  *Miller Brewing Co. v. Carling O'Keefe Breweries*, 452 F.

Supp. 429, 444-45 (W.D.N.Y. 1978).  However, "even close similarity between two marks is not

dispositive of the issue of likelihood of confusion."  *McGregor-Doniger Inc. v. Drizzle Inc*., 599

F.2d 1126, 1133 (2d Cir. 1979); *see also E.S. Originals Inc. v. Stride Rite Corp*., 656 F. Supp.

484, 487 (S.D.N.Y. 1987) ("The fact that the 'ZIPS' and 'ZIP 'N GO' marks share a common

word does not necessarily render them confusingly similar, as similarity in and of itself is not

dispositive.").  "Rather, the crux of the issue is whether the similarity is likely to cause confusion

among numerous customers who are ordinarily prudent."  *Swatch Group, Inc. v. Movado Corp*.,

01-CV-0286, 2003 WL 1872656, at *3 (S.D.N.Y. Apr. 10, 2003) (citing *Morningside Group Ltd.

v. Morningside Capital Group L.L.C.*, 182 F.3d 133, 139-40 [2d Cir. 1999]).  "Therefore, when

assessing similarity, the court must look at the full name of each party's product, and may take

into account the fact that the marks are visibly and audibly distinguishable."  *Stride Rite Corp*.,

656 F. Supp. at 487 (citations omitted).

Stated another way, depending on the degree of prominence, differences between marks

may be capable of dispelling confusion among consumers.  *See generally Virgin Enter. Ltd. v.

Nawab*, 335 F.3d 141, 149 (2d Cir. 2003).  Having said that, a consumer who remembers the

name of a product does not necessarily remember the typeface and color of that product's mark.

*Virgin Enter. Ltd.*, 335 at 149.  In addition, "[t]he reputation of a mark also spreads by word of

mouth among consumers[,] such that a consumer who hears from others about their experiences

with the registrant's product and then encounters defendants' product will have no way knowing

of the differences in typeface."  *Virgin Enter. Ltd.*, 335 F.3d at 149.  Therefore, the existence of

minor differences in appearance, such as differences in the typeface of the logos and coloring of

the words, when considered "in relation to the fact that the name being used as a trademark was

the same in each case," is not sufficient to conclude that the marks are not sufficiently similar.

*Id.*

In *Virgin*, the plaintiffs owned the federally registered mark "VIRGIN," while defendants

operated under the name "VIRGIN [WIRELESS, MOBILE, COMMUNICATIONS, and NET]."

*Id*. at 144.  In assessing the degree of similarity between the marks, the Court found that the

marks were "not merely similar; they were identical to the extent that both consisted of the same

word, 'virgin.'"  *Id*. at 149.  Based on this finding, the Court of Appeals rejected the district

court's reasoning that the marks lacked similarity because of the differences in the parties'

typeface and color, and held, as a matter of law, that "defendants' mark was sufficiently similar

to plaintiff's to increase the likelihood of confusion."  *Id*.

The facts of *Virgin* are analogous to those in the present case.  Defendants, who operate a

motorcycle club as do Plaintiffs, have simply added the word "'Cuse" in front of the words

"Road Dawgs."  Moreover, both sets of words appear in gold color in all capital letters above an

image of a dog.  In this regard, there is a strong similarity between the marks.

As a result, the Court concludes that this factor weighs in favor of finding a likelihood of

confusion between the marks.

### c. Proximity of Parties in Marketplace

"The proximity inquiry asks to what extent the two products compete with each other."

*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004) (citation

omitted).  "In assessing product proximity we look at the nature of the products themselves and

the structure of the relevant market."  *Brennan's Restaurant, L.L.C.*, 360 F.3d at 134 (citation

omitted).

"The competitive proximity factor has two elements, market proximity and geographic proximity." *Id*. "Market proximity asks whether the two products are in related areas of commerce[,] and geographic proximity looks to the geographic separation of the products." *Id*. "Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id*. If the record indicates that the two parties operate within the same general market, then such evidence may be sufficient for a showing of competitive proximity. *Virgin*, 335 F.3d at 149-50.

Here, as explained above in Part III.C. of this Second Amended Decision and Order, the record contains evidence indicating that (1) Defendants serve a similar market as do Plaintiffs (motorcycle riders in the Syracuse area), and (2) Defendants attend comparable social and charitable events.

Granted, Defendants argue that the market in which they operate is exclusively a market involving African-American motorcycle riders on the South Side of Syracuse, while the market in which Plaintiffs operate is distinct from that market. However, Defendants' assert only that they are "based" in the South Side of Syracuse. (Dkt. No. 15 at 14, ¶ 21.) Further, they admit they have worn their "colors" along "the entire east coast, and west to at least Detroit and south to Florida and east of the Mississippi." (*Id*. at 14, ¶ 24.) Indeed, they admit they have crossed paths with Plaintiffs at Americade (in or near Lake George, New York) in June of 2001, and the New York State Fair in Syracuse at some point after September 11, 2001. (*Id*. at 12, ¶ 5.) They also admit that their president is a member of law enforcement (and that Plaintiffs are composed of members of law enforcement). (*Id*. at 13, ¶¶ 6, 10.) Finally, record evidence exists that at

42

least some of the members of Plaintiffs' club are African American.  (*Id*. at 108.)

For all these reasons, the Court finds the parties to be in competitive proximity.  As a result, the Court concludes that this factor weighs in favor of finding a likelihood of confusion between the marks.

### d.      Likelihood that Plaintiffs Will "Bridge-The-Gap"

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus*., 412 F.3d at 387 (citation omitted).  When the parties' products "are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case."  *Star Indus*., 412 F.3d at 387 (citations omitted).

Because competitive proximity has already been established, the Court finds it to be highly likely that Plaintiffs' will "Bridge-the-Gap," if any such "gap" even exists.  As a result, the Court concludes that this factor weighs neither in favor of, nor against, a finding a likelihood of confusion between the marks.

### e.      Evidence of Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."  *Lois Sportswear*, 799 F.2d at 875.  Having said that, "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion."  *Savin Corp*., 391 F.3d at 459 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 [5th Cir. 1971]).

Here, the Court notes that (1) in its coverage of the stabbing that occurred near

Defendants' club, the media used *Plaintiffs'* name by mistake, and (2) in its coverage of the

deadly shooting that occurred near Defendants' club, the media used Defendants' name once, and

then Plaintiffs' name four times. *See*, *supra*, note 56 of this Second Amended Decision and

Order. Based on the Court's review of the relevant case law, the Court concludes that these two

newspaper articles constitute at least some evidence of actual consumer confusion. This case

law comes from both inside the Second Circuit,[66] and outside the Second Circuit.[67] As a result,

---

[66]    *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp.2d 339, 356-57 (S.D.N.Y. 1998)
(finding evidence of actual confusion where "numerous newspaper articles have expressly
identified [Defendant's Film] as a sequel to [Plaintiff's film]" based on the similarities in the
titles); *Lawn Tennis Assoc. v. British Tennis Agency, Ltd.*, 86-CV-4141, 1986 U.S. Dist. LEXIS
22852, at *10, 21 (S.D.N.Y. July 14, 1986) ("The Court takes the . . . mistaken newspaper
column [which apparently confuses the Lawn Tennis Association with the British Tennis
Agency] . . . as proof of the likelihood of confusion that exists as to the source of Wimbledon
and Royal Wedding travel packages and tickets."); *Kingsmen v. K-Tel Intern. Ltd.*, 557 F. Supp.
178, 182 (S.D.N.Y. 1983) (finding evidence of actual confusion where "Plaintiffs have submitted
numerous newspaper clippings from this period that identify these plaintiffs both pictorially and
by caption with the group The Kingsmen"); *Cuisinarts, Inc. v. Robot-Coupe International Corp.*,
509 F. Supp. 1036, 1044 (S.D.N.Y. 1981) ("[I]f proof of actual confusion were required, it is
furnished by the three quoted newspaper articles. That a trio of independent journalists (two of
them food writing specialists) reached the same erroneous conclusion concerning the nature of
the food processors now being sold, and Cuisinarts' status in the industry, is eloquent testimony
to the misleading propensity of certain aspects of RC-I's campaign.").

[67]    *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 802 (4th Cir.
2001) (finding evidence of actual confusion where plaintiff "offered over 30 newspaper clippings
from around the country in which persons wearing the Duffy costume were depicted but the
newspaper reported them as 'Barney'"); *Piper Aircraft Corp. v. Wag-Aero*, No. 83-1797, 741
F.2d 925, at 935 (7th Cir. 1984) ("The evidence of actual confusion consisted primarily of three
documents: a newspaper article; a magazine article; and, a letter from the Soaring Society of
America to the FAA."); *Acad. of Motion Picture Arts and Sci. v. Creative Housing Promotions,
Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (finding evidence of actual confusion where "a
newspaper article describing a Star Award presented to an Iowa theater manager as an Oscar");
*Auto. Club of S. Cal. v. Auto Club, Ltd.*, 05-CV-3940, 2007 WL 704892, at *4 (C.D. Cal. March
6, 2007) (finding evidence of actual confusion where plaintiff submitted "numerous newspaper
and trade articles using 'AUTO CLUB' interchangeably with Plaintiff"); *General Conf. Corp. of
Seventh-Day Adventists v. Perez*, 97 F. Supp. 2d 1154, 1157 (S.D. Fla. 2000) ("[A]ctual
confusion . . . is evidenced by newspaper articles reflecting confusion in the minds of those

the Court concludes that this factor weighs in favor of a finding a likelihood of confusion

between the marks.

### f.        Defendants' Intent in Adopting the Mark

This factor "looks to whether the defendant adopted its mark with the intention of

capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior

user's product."  *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (citing

*Edison Bros. Stores v. Cosmair, Inc*., 651 F. Supp. 1547, 1560 [S.D.N.Y. 1987]).  "Good faith

can be found if a defendant has selected a mark which reflects the product's characteristics, has

requested a trademark search or has relied on the advice of counsel."  *W.W.W. Pharm. Co. v.*

*Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993); *see also The Sports Authority, Inc. v. Prime*

*Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (noting that consulting with an attorney or

conducting a trademark search constitutes evidence of good faith).  Conversely, "[a]n inference

of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to

---

attending church services of both entities . . . ."); *Am. Empl. Ins. v. Acadia Ins. Co.*, 39 F.
Supp.2d 64, 69 (D. Me. 1999) (finding actual confusion due to misidentification of parties in
"many newspapers across the United States"); *SunAmerica Corp. v. Sun Life Assur. Co. of
Canada*, 890 F. Supp. 1559, 1576 (N.D. Ga. 1994) ("Confusion exists when . . . newspapers
confuse the names of the parties in reporting financial events . . . ."); *Calamari Fisheries, Inc. v.
The Village Catch, Inc.,* 698 F. Supp. 994, 1003-04 (D. Mass. 1988) (finding that evidence of
actual confusion included newspaper article confusing the plaintiff's and defendant's restaurants
and numerous affidavits from staff and customers detailing confusion leading to mistaken
purchases); *Pro Hardware, Inc. v. Home Ctr. of Am., Inc.*, 607 F. Supp. 146, 152 (S.D.
Tex.1984) ("The Court considers persuasive of actual confusion . . . the fact that a neutral
reporter from the *Corpus Christi Caller-Times* in a newspaper article about this dispute confused
the two names.  The Court finds that there has been actual confusion of the names."); *cf. Tse,
Saiget, Watanabe, & McClure, Inc. v. Gentlecare Sys, Inc.*, No. 90-86, 1990 U.S. Dist. LEXIS
18510, at *5 (D. Or. Apr. 27, 1990) ("Plaintiff has also mistakenly been sent defendants' printed
advertisements from local newspapers. I find plaintiff's affidavits showing confusion of . . .
major newspapers persuasive on the issue of actual confusion.").

trade upon the good will represented by that mark."  *EMI Catalogue P'ship v. Hill, Holliday,*

*Connors, Cosmopulos Inc*., 228 F.3d 56, 67 (2d Cir. 2000).  When the evidence, taken as a

whole, "does not conclusively point to a finding of either good or bad faith, . . . [the] issue, like

many intent issues, is best left in the hands of the trier of fact."  *The Sports Authority, Inc.*, 89

F.3d at 965.

　　　　In the present case, Defendants maintain that they did not create their mark in an attempt

to capitalize off Plaintiffs' goodwill and reputation; rather, Defendants maintain that the idea for

their mark was prompted by lyrics from a rap song.  (Dkt. No 15, at 31.)  Conversely, Plaintiffs

urge the Court to find bad faith on the part of Defendants because Defendants had actual

knowledge of Plaintiffs' mark prior to adopting a virtually identical mark.  (Dkt. No. 13, Part 12,

at 7.)

　　　　Based on the current record, the Court finds that Plaintiffs have not established that

Defendants had actual knowledge of Plaintiffs' mark prior to the date that Defendants began

using the name "'Cuse Road Dawgs" in August of 1999.  Having said that, "[b]ad faith may be

inferred from the junior user's . . . constructive knowledge of the senior user's mark."  *Star*

*Indus*., 412 F.3d at 389.  Here, Plaintiffs had been using their mark for approximately two years

in Syracuse, by the time Defendants started using their mark.  However, after carefully

considering the matter, the Court concludes that this factor weighs neither in favor of, nor

against, a finding a likelihood of confusion between the marks.

### g.　　Quality of Defendants' Services

　　　　This factor will be held to favor a plaintiff if the defendant's services are of inferior

quality, "thereby tarnishing plaintiff's reputation if consumers confuse the two [marks]."

*Morningside Group Ltd.*, 182 F.3d at 142.

In the present case, it is undisputed that Plaintiffs' membership is limited to law enforcement professionals.  *See, supra,* Part III.A.2. of this Second Amended Decision and Order.  According to the  Plaintiffs, the quality of Defendants' services tarnishes Plaintiffs' mark, because (1) Plaintiffs' membership consists exclusively of law enforcement professionals, and (2) articles were published in the Syracuse *Post-Standard* reporting illegal activity near Defendants' premises.  In response, Defendants deny any involvement in the illegal activities discussed in the articles, and argue that the articles are hearsay.[68]

As explained above in Part III of this Second Amended Decision and Order, one of the main services that Defendants offer is the hosting of parties at their clubhouse, at which alcohol is served, and near which criminal activity has been reported in newspaper articles (that confused Defendants' club name and Plaintiffs' club name).[69]  Furthermore, one of the main qualities of Plaintiffs' club is that their membership consists exclusively of law enforcement professionals.  For these reasons, the Court finds that Defendant's services have tarnished Plaintiffs' mark.

As a result, the Court concludes that this factor weighs in favor of finding a likelihood of confusion between the marks.

### h.    Sophistication of Consumers

---

[68]        (Dkt. No. 15, at 17, ¶ 45; Dkt. No. 15, at 30.)

[69]        The Court notes that Defendants do not appear to appreciate the materiality of the two newspaper articles in question.  The newspaper articles are material regardless of the truth of the matters asserted in the articles (including whether the crimes reported in the articles occurred "at" or "near" Defendants' premises, and regardless of whether Defendants served alcohol to the criminal perpetrators or victims on the nights in question).  Rather, the articles' materiality stems from the fact that they were published and that they misused, or used as interchangeable, Plaintiffs' and Defendants' club names in relation to criminal activity.

The final factor for analysis, the sophistication of the consumers, concerns the type of consumers of the parties' products and services. "[The] analysis of consumer sophistication 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.' " *Star Indus.*, 412 F.3d at 390 (quoting *Sports Auth.*, 89 F.3d at 965). "The level of sophistication, or lack thereof, can be proven either by direct evidence, such as with a survey or expert opinion, or the Court may rely on indirect indications of sophistication established by the nature of the product or its price." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*, 447 F. Supp.2d 266, 286 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

Here, neither party has presented any evidence establishing the degree of sophistication among their respective consumers. In addition, the Court finds that there are no "indirect indications" of sophistication in the record. As a result, the Court concludes that this factor weighs neither in favor of, nor against, a finding a likelihood of confusion between the marks.

### 3.    Balance of Equities

In summary, the Court concludes that five of the *Polaroid* factors favor finding a likelihood of confusion between the marks, and that three of the factors are neutral. As a result, the Court finds that Plaintiffs have demonstrated that there is a significant likelihood of confusion among Plaintiffs' mark and Defendants' mark. For these reasons, the Court grants Plaintiffs' motion for summary judgment, and denies Defendants' cross-motion for summary judgment, with regard to Defendants' liability on Plaintiffs' claim under Section 1114(1) of the Lanham Act.

## B.      Plaintiffs' Request for Relief Under Section 1116 of the Lanham Act

As relief for Defendants' violation of Section 1114(1) of the Lanham Act, Plaintiffs

request, among other things, the Court "permanently enjoin Defendant[s] and those acting in

concert with [them] from continuing infringement of the ROAD DAWGS mark," under Section

1116 of the Lanham Act.  (Dkt. No. 16, at 6.)

"Courts have the authority to grant injunctive relief under the Lanham Act according to

the principles of equity and upon such terms as the court may deem reasonable, to prevent the

violation of any right of the registrant of a mark registered in the Patent and Trademark Office or

to prevent a violation under Section 43(a) of the Lanham Act."  *Philip Morris USA Inc. v. A & V*

*Minimarket, Inc.*, 592 F. Supp.2d 669, 675 (S.D.N.Y. 2009) (citing 15 U.S.C. § 1116[a]).  "In

general, a plaintiff may obtain a permanent injunction if it shows (1) actual success on the merits

and (2) irreparable harm."  *A & V Minimarket, Inc.*, 592 F. Supp.2d at 675 (internal quotation

marks and citations omitted).[70]  "In the context of trademark infringement and false designation

of origin claims, the second prong is automatically satisfied by actual success on the merits, as

irreparable harm is established by a showing of likelihood of confusion."  *Chloe*, 2009 WL

1227927, at *11.  Simply stated, "a showing of likelihood of confusion . . . establishes

irreparable harm."  *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997)

("[T]he requirement of irreparable harm carries no independent weight, as we have held that a

showing of likelihood of confusion (a requirement of both trademark infringement and unfair

competition claims) establishes irreparable harm.").

---

[70]      *See also Chloe v. DesignersImports.com USA, Inc.*, 07-CV-1791, 2009 WL
1227927, at *11 (S.D.N.Y. Apr. 30, 2009) ("To obtain a permanent injunction, [the moving
party] must demonstrate (1) actual success on the merits and (2) irreparable harm.").

Based on this legal standard, and the fact that Plaintiffs have prevailed on their claim arising under Section 1114(1) of the Lanham Act, the Court finds that they are entitled to injunctive relief.  As a result, Plaintiffs' motion is granted in this regard.  Defendants (as well as their members, officers, agents, servants, employees and attorneys), and any other persons who are in active concert or participation with any of Defendants (or their members, officers, agents, servants, employees and attorneys, if they have received actual notice of the permanent injunction by personal service or otherwise), are permanently enjoined from using the trade name or corporate name "'Cuse Road Dawgs" or any other imitation or confusingly similar designation that uses the words "Road" and "Dawgs" either alone or in combination with any other words, names or symbols in connection with the offering of services to promote the interests of any motorcycle club (hereinafter, "the Trade Name") either inside or outside of Defendants' clubhouse.[71]

More specifically, this permanent injunction requires that the entities or persons described in the preceding sentence take the following actions:

(1) remove, delete or permanently cover up the Trade Name from all apparel and accessories, including, but not limited to, all jackets, T-shirts, hats, and sew-on rockers, belt buckles, buttons, and jewelry within THIRTY (30) DAYS of the date of this Second Amended Decision and Order;

---

[71]   The Court notes that, under the terms of this Second Amended Decision and Order, Defendants may continue to use the stylized pit bull portion of their logo as long as the modified logo contains neither (1) the term "Road Dawgs" nor (2) any colorable imitation of that term that is confusingly similar to that term (or that is otherwise implicative of a false designation of origin, sponsorship or approval of Defendants' services with Plaintiffs' organization).

(2) remove, delete or permanently cover up the Trade Name from the side of the building

housing Defendants' clubhouse at 510 Midland Avenue, Syracuse, New York by MAY

30, 2010;

(3) remove, delete or permanently cover up the Trade Name from all other displays,

including, but not limited to, all signs, billboards, emblems, stickers, labels, flags,

banners, pennants, and streamers within THIRTY (30) DAYS of the date of this Second

Amended Decision and Order;

(4) remove, delete or permanently cover up the Trade Name from all paraphernalia,

including, but not limited to, all motorcycles, vehicles, helmets, gear, cups, and pens

within THIRTY (30) DAYS of the date of this Second Amended Decision and Order; and

(5) remove, delete or permanently cover up the Trade Name from all publications,

including, but not limited to, all books, booklets, handbooks, manuals, directories,

albums, pamphlets, flyers, and internet web sites (including domain names) within

THIRTY (30) DAYS of the date of this Second Amended Decision and Order.

### C.    Plaintiffs' Other Requests for Relief

In their Complaint, Plaintiffs requested recovery of damages stemming from Defendants'

use of the name "'Cuse Road Dawgs." (Dkt. No. 1, at 9.) Plaintiffs argue that the Court should

hold a hearing for a determination of damages and appropriate fees. (Dkt. No. 13, at 1.)

In an action for trademark infringement, a plaintiff may recover damages as

compensation for damage to reputation, diverted sales, or other harm stemming from unfair

competition. *Vuitton Et Fils, S.A. v. Crown Handbags*, 492 F. Supp. 1071, 1077 (S.D.N.Y

1979). More specifically, pursuant to 15 U.S.C. § 1117, and subject to the principles of equity, a

plaintiff may be entitled to (1) defendant's profits, (2) any damages sustained by the plaintiff, (3) the costs of the action. 15 U.S.C. § 1117(a).  Generally, to receive compensation, a plaintiff must demonstrate with specificity that a specific injury or profitable infringement occurred.  *Vuitton Et Fils, S.A.*, 492 F. Supp at 1077 (citing *Monsanto Chem. Co. v. Perfect Fit Mfg. Co., Inc.*, 349 F.2d 389, 392 [2d Cir. 1965]).[72]  In other words,  the discretionary award of damages based on either harm suffered by plaintiff or defendant's profits must rest on an evidentiary basis that an injury or profitable infringement has already been suffered.  *Caesars World, Inc.*, 520 F.2d at 274-75.

As a result, the "mere possibility" of an injury, while sufficient to warrant an injunction, does not establish the evidentiary basis necessary to obtain monetary relief.  *Vuitton Et Fils, S.A.*, 492 F. Supp at 1077 (although defendant blatantly infringed upon plaintiff's trademark, damages were not awarded because the record was "devoid of evidence demonstrating plaintiff's actual damages"); *see also Caesars World, Inc.*, 520 F.2d at 274-75.  Moreover, it is important to note that, in order to recover the defendant's profits, the plaintiff must demonstrate the defendant's bad faith or willful deception.  *See George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) ("[U]nder § 35(a) of the Lanham Act, a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting."), *cert. denied*, 506 U.S. 991 (1992); *cf. Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 308

---

[72]        *See also Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975) ("'Damages' means an award based on either actual damages to the plaintiff or actual profits of the infringer, measurable in dollars and cents.") (internal quotations and citations omitted); *Optimum Techn., Inc. v. Henkel Consumer Adhesives, Inc.*, 04-CV-1082, 2006 WL 1663357, at *3 (N.D. Ga. Jun. 14, 2006) (citing *Computer Access Tech. Corp. v. Catalyst Enters., Inc.*, 273 F. Supp.2d 1063, 1076 [N.D. Cal.2003]) ("Trademark remedies are guided by tort principles and so a reasonable basis for computation [of damages] must exist").

F. Supp. 489, 494 (S.D.N.Y 1969) (plaintiff was entitled to an accounting for defendant's profits, where defendant persisted in use of the 'Kiki' mark, "*after being notified* by the Patent Office" of Plaintiffs' registration of the mark) (emphasis added).

Here, Plaintiffs have not adduced sufficient admissible record evidence in support of their request for a hearing to determine damages. Because Plaintiffs are a non-profit organization, they are unable to assert against Defendants any specific claim of lost sales or profits. *See Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 580 F. Supp. 634, 637 (S.D.N.Y. 1984) ("Cuisinarts does not claim lost sales or profits. Therefore it has not sustained damages"). Moreover, they have failed to adduce sufficient admissible record evidence to persuade the Court that Defendants acted in bad faith or with willful deceitfulness, or that Defendants have profited from their use of the name "'Cuse Road Dawgs." The Court notes that the available record evidence indicates that liquor sold by Defendants to non-members has been sold at cost.

Finally, with regard to attorney's fees, only in "exceptional" trademark infringement cases will courts award reasonable attorney's fees. 15 U.S.C. § 1117(a). Exceptional cases are those where "deliberate and flagrant" infringement has occurred. *Vuitton Et Fils, S.A.*, 492 F. Supp at 1078 (citing S. Rep. No. 93-1400, 93rd Cong., 2d Sess [1974]); *see also Cuisinarts*, *Inc.*, 580 F. Supp. at 636 ("An accounting should be granted if . . . [it] is necessary to deter a *willing* infringer from doing so again") (emphasis added). Here, Plaintiffs have not adduced sufficient admissible record evidence to persuade the Court that Defendants' infringement was "malicious," "fraudulent," "deliberate," or "willful." *Vuitton Et Fils, S.A.*, 492 F. Supp at 1078 (citing S. Rep. No. 93-1400, 93rd Cong., 2d Sess [1974]).

For all these reasons, the Court denies Plaintiffs' request for a hearing to determine

damages.

### D.      Plaintiffs' Other Claims

As stated above in Part I of this Second Amended Decision and Order, Plaintiffs' Complaint also asserts claims under Section 1125(a)(1) of the Lanham Act, New York common law of trademark infringement, and New York General Business Law.  It is not entirely clear, from the parties' motion papers, whether they intended to move, and/or cross-move, for summary judgment with regard to any of these remaining claims.  In any event, the Court finds that, even if the parties had so moved, the Court's analysis of these claims would be moot, in light of the Court's finding of liability with regard to Plaintiffs' claim under Section 1114(1) of the Lanham Act.  As a result, any such request would be denied without prejudice as moot.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 13) is **GRANTED** in part and **DENIED** in part, as described above in this Second Amended Decision and Order; and it is further

**ORDERED** that Defendants' cross-motion for summary judgment (Dkt. No. 15) is **DENIED**; and it is further

**ORDERED** that Defendants (as well as their members, officers, agents, servants, employees and attorneys), and any other persons who are in active concert or participation with any of Defendants (or their members, officers, agents, servants, employees and attorneys, if they have received actual notice of the permanent injunction by personal service or otherwise), are permanently enjoined from using the trade name or corporate name "'Cuse Road Dawgs" or any other imitation or confusingly similar designation that uses the words "Road" and "Dawgs"

54

either alone or in combination with any other words, names or symbols in connection with the offering of services to promote the interests of any motorcycle club (hereinafter, "the Trade Name") either inside or outside of Defendants' clubhouse; more specifically, this permanent injunction requires that the entities or persons described in the preceding sentence take the following actions:

(1) remove, delete or permanently cover up the Trade Name from all apparel and accessories, including, but not limited to, all jackets, T-shirts, hats, and sew-on rockers, belt buckles, buttons, and jewelry within THIRTY (30) DAYS of the date of this Second Amended Decision and Order;

(2) remove, delete or permanently cover up the Trade Name from the side of the building housing Defendants' clubhouse at 510 Midland Avenue, Syracuse, New York by MAY 30, 2010;

(3) remove, delete or permanently cover up the Trade Name from all other displays, including, but not limited to, all signs, billboards, emblems, stickers, labels, flags, banners, pennants, and streamers within THIRTY (30) DAYS of the date of this Second Amended Decision and Order;

(4) remove, delete or permanently cover up the Trade Name from all paraphernalia, including, but not limited to, all motorcycles, vehicles, helmets, gear, cups, and pens within THIRTY (30) DAYS of the date of this Second Amended Decision and Order; and

(5) remove, delete or permanently cover up the Trade Name from all publications, including, but not limited to, all books, booklets, handbooks, manuals, directories, albums, pamphlets, flyers, and internet web sites (including domain names) within

THIRTY (30) DAYS of the date of this Second Amended Decision and Order.

Dated: December 30, 2009
Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge